# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

PORFIRIO DUARTE-HERRERA,

Petitioner,

v.

WILLIAM HUTCHINGS,[1] et al.,

Respondents.

Case No. 2:15-cv-01843-GMN-DJA

**ORDER**

Porfirio Duarte-Herrera is a Nevada prisoner who was convicted of, *inter alia*, first-degree murder with the use of a deadly weapon and two counts of attempted murder with the use of a deadly weapon in two trials[2] concerning two bombing incidents—hereinafter "the Luxor bombing trial" and "the Home Depot bombing trial"—and is serving, *inter alia*, a life sentence without the possibility of parole. (ECF Nos. 54-6, 78-5.)  Duarte-Herrera filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 64.)  For the Luxor bombing trial, Duarte-Herrera alleges that the state district court violated his right to present evidence, his trial should have been severed from his co-defendant's trial, and counsel failed to suppress his confession.  For the Home Depot bombing trial, Duarte-Herrera alleges that the state district court improperly prohibited him from questioning detectives.  And for both trials, Duarte-Herrera alleges that there were erroneous jury instructions given, there was insufficient evidence to support his convictions for attempted murder,

---

[1] The state corrections department's inmate locator page states that Duarte-Herrera is currently incarcerated at Southern Desert Correctional Center.  William Hutchings is the current warden for that facility.  At the end of this order, this court directs the clerk to substitute William Hutchings as a respondent for the prior Respondent Brian Williams, pursuant to rule 25(d) of the Federal Rules of Civil Procedure.

[2] Rule 2(e) of the Rules Governing Section 2254 Cases permits Duarte-Herrera to challenge different judgments of conviction from the same court in the same federal petition.

and counsel failed to investigate his innocence.  This court denies Duarte-Herrera's habeas petition, denies him a certificate of appealability, and directs the clerk of the court to enter judgment accordingly.

## I.   BACKGROUND[3]

### A.   The Luxor bombing trial[4]

Caren Chali testified[5] that on May 7, 2007, at a little past 4:00 a.m., she and her boyfriend, Willebaldo Antonio Dorantes, were walking to Dorantes' vehicle, which was parked in the Luxor Hotel & Casino (hereinafter "the Luxor") parking garage in Las Vegas, Nevada, after work. (ECF No. 42-4 at 22–23, 26.)  As they approached Dorantes' vehicle, Chali saw a coffee cup on the roof of the vehicle "by the driver's side." (*Id.* at 26.)  Dorantes "made a comment that somebody had left [the] coffee cup and . . . told [Chali] to get in the car." (*Id.*)  As Chali entered the front passenger seat, she heard an explosion and ducked. (*Id.* at 26, 47.)  Chali ran around the car and saw Dorantes lying on the ground severely injured. (*Id.* at 27.)  Chali was not harmed, but Dorantes died shortly

---

[3] This court makes no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court.  This court's summary is merely a backdrop to its consideration of the issues presented in the case.  Any absence of mention of a specific piece of evidence does not signify this court overlooked it in considering Duarte-Herrera's claims.

[4] Duarte-Herrera was tried together with codefendant Omar Rueda-Denvers in the Luxor trial.  Rueda-Denvers' federal habeas petition was conditionally granted, subject to a retrial in state court, in Case No. 03-13-cv-00309-MMD-WGC, on a basis inapplicable to the present case.

[5] Chali's pre-trial deposition was played for the jury. (*See* ECF No. 51-1 at 14–15.)  At trial, an unredacted copy of the deposition transcript was admitted as a court exhibit to make a record of Chali's testimony for appeal. (*Id.* at 10–12.)  It is not apparent which portions of the deposition reflected in the unredacted transcript were redacted from the video played to the jury.  Duarte-Herrera filed a copy of the unredacted transcript in the federal record.  This copy has handwritten notes in the margins.  This court has not proceeded based on any speculation in that regard.  This court's summary of Chali's testimony instead reflects portions of her testimony in the transcript that the opening statements, argument during the trial, and the closing arguments tend to reflect were included in the video at trial.  If Duarte-Herrera were to maintain that testimony referenced herein instead was redacted, the burden would fall upon him to show via the state court record that such deposition testimony was redacted from the video played at trial.

after the explosion. (*Id.* at 47; ECF No. 51 at 101.)  The medical examiner testified that a large fragment of metal "entered [Dorantes'] brain . . . creat[ing] a seven centimeter . . . furrow." (ECF No. 51-1 at 85, 89–90.)  Dorantes' autopsy also revealed torn skin and abrasions on his face, stippling on the whites and corneas of his eyes, a mangled right hand, and missing skin on his upper right arm. (*Id.* at 90, 92, 94–95.)

After reviewing surveillance footage of the Luxor parking garage, law enforcement created a composite video of the night in question, which showed a vehicle enter the parking garage at 1:11 a.m. and drive around for several minutes as if "searching for something in the parking lot." (ECF No. 51 at 116, 125, 127.)  At 2:37 a.m., the surveillance footage showed "that same vehicle come back up onto the roof of the parking garage, . . . [and] park directly next to [Dorantes'] vehicle." (*Id.* at 127–28.)  That vehicle, later identified as a 2006 Chevrolet Cobalt, was parked next to Dorantes' vehicle for "probably 20 plus seconds." (*Id.* at 128, 131.)

Law enforcement asked Chali about the 2006 Cobalt, and she gave law enforcement the name of her ex-boyfriend, Alexander Perez. (ECF No. 51 at 131–32.)  Chali testified that she met Perez in Guatemala in 2000, started dating him in 2001, and had a child with him in 2004. (ECF No. 42-4 at 8, 10, 37.)  Perez came to the United States in 2004 and thereafter told Chali that he wanted her and their child to come to the United States. (*Id.* at 14.)  Chali agreed and met Perez in Las Vegas in April 2006; however, they separated 15 days after her arrival. (*Id.* at 15–17.)  Chali started dating Dorantes in July 2006. (*Id.* at 19.)  In August 2006, Perez told Chali that he wanted to get back together, but she declined, telling him that she "was already dating someone else." (*Id.* at 21.)  Chali testified that she and Perez worked for a man named Omar Rueda-Denvers in Panama in 2003 and that Perez later assumed Rueda-Denvers' name. (*Id.* at 10–13.)

Law enforcement learned that the 2006 Cobalt was registered to Rosa Alfonso. (ECF No. 51 at 135.) Alfonso testified that she met Rueda-Denvers in March 2004, started dating him several months later until December 2006, and remained friends with him thereafter. (*Id.* at 176–178, 180.) Alfonso testified that Rueda-Denvers was "[v]ery good friends" with Duarte-Herrera and that Rueda-Denvers and Duarte-Herrera saw each other daily in the months leading up to May 2007. (*Id.* at 179.) On May 6, 2007, sometime past 11:00 p.m., Rueda-Denvers was at Alfonso's residence when he got a telephone call from Duarte-Herrera. (*Id.* at 190.) Rueda-Denvers told Alfonso that he "need[ed] to go" following that telephone call. (*Id.*) On previous occasions, Rueda-Denvers had conveyed to Alfonso that he felt rejected by Chali and that "he knew where [Chali] worked and the hours that she worked there." (*Id.* at 187–88.) Alfonso noticed that the spare key to her Cobalt was missing on May 1, 2007. (*Id.* at 193.)

Law enforcement conducted an interview of Rueda-Denvers, and although he denied involvement in the bombing, Rueda-Denvers admitted he drove Alfonso's Cobalt that night and that "he had gone to the Luxor . . . because he wanted to see his daughter." (ECF No. 52 at 166, 226.) Rueda-Denvers also admitted he followed Chali extensively in either his vehicle or Alfonso's Cobalt and knew where Chali worked, Chali's work schedule, that Chali was dating Dorantes, and Dorantes' vehicle. (*Id.* at 161, 183, 168; ECF No. 52-1 at 41–42.)

Law enforcement searched Rueda-Denvers' vehicle and found a pair of wire cutters, a role of electrical tape, an electrical current tester, various wires, and keys to Alfonso's Cobalt. (ECF Nos. 51 at 141–42; 51-1 at 108–110.) Law enforcement also found a drill bit set in Rueda-Denvers' residence. (ECF No. 51-1 at 66–67, 69.) And after learning that Rueda-Denvers worked maintenance at a condominium complex, law enforcement searched a maintenance shed that Rueda-Denvers had access to and found "a box of 9-volt batteries." (*Id.* at 17–18, 64.) The 9-bolt

batteries found in the shed were the same type and manufacturer as the battery used in the bomb. (ECF No. 52 at 73.)

Law enforcement also conducted an interview of Duarte-Herrera, and, although he initially denied any involvement, Duarte-Herrera eventually admitted "that he made a bomb" and "knew that it was to go off at the Luxor," though he denied going to the Luxor or activating the bomb. (ECF No. 52 at 10.)   Ultimately, Duarte-Herrera told law enforcement that although "he was hesitant at first [of] . . . plac[ing] the bomb on the car . . . because it[ was] not [his] problem," he placed the bomb "[n]ear the center of the roof of the car on the driver's side," went to a nearby gas station, waited until he heard ambulance sirens, and then returned Alfonso's Cobalt and went home. (*Id.* at 132, 147–49.)   Duarte-Herrera also told law enforcement that the bomb had been placed in a cup, that a magnet was placed inside the cup so that it would stay on the vehicle,[6] and that the bomb was made of "[b]lack [shotgun] powder, a lightbulb . . . , [and] an old [car] switch." (*Id.* at 10–11.)   Duarte-Herrera then "volunteered to draw [the bomb] out for [law enforcement]." (*Id.* at 124; *see also* ECF No. 40-2 at 24.)   Law enforcement searched Duarte-Herrera's residence and found, *inter alia*, a can of expanding spray foam similar to the spray foam used in the bomb, a strand of Christmas tree lights that had been cut with some of the lights removed,[7] pipe end caps of a different size and manufacture than the pieces found in the bomb, and two soldering irons. (ECF No. 52 at 72, 84–86, 90.)

Duarte-Herrera called an explosives expert, Donald Hansen. (ECF No. 52-1 at 90.)   Hansen testified that the bomb depicted in Duarte-Herrera's drawing contained all the mechanisms of a

---

[6] Danny Waltenbaugh, an explosives specialist for the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified that "there was a magnet recovered at the scene, but it could not be determined that the magnet in and of itself was part of the device." (ECF No. 52 at 16, 76.)

[7] Waltenbaugh testified that a filament from a lightbulb was used "to heat up [the] explosive material" in the bomb. (ECF No. 52 at 92.)

pipe bomb: "the power source, . . . the triggering mechanism, the safe arm switch." (*Id.* at 109.) However, Hansen testified that the bomb depicted in Duarte-Herrera's drawing "would not work because the string coming through the foam would be immobilized and it would . . . negate the operation of th[e] switch on top of the . . . mechanism." (*Id.* at 101–02.)

A jury found Duarte-Herrera guilty of first-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, two counts of possession of an explosive or incendiary device, and transportation or receipt of explosives for an unlawful purpose with substantial bodily harm in the Luxor bombing. (ECF No. 53-3.) The Nevada Supreme Court affirmed Duarte-Herrera's judgment of conviction and the denial of his state habeas petition. (ECF Nos. 55-7; 59-4.)

## B.       The Home Depot bombing trial[8]

On October 31, 2006, Ryan Wallace drove his 2006 Dodge Ram to his job at a Home Depot store in Las Vegas, Nevada, and parked at the back of the parking lot. (ECF No. 77-1 at 24–26, 28–29.) At approximately 8:30 p.m., while still working, Wallace heard and felt a "violent" explosion. (*Id.* at 30, 49.) Wallace exited the store, "saw a plume of white smoke rising," and realized that the explosion came from his truck. (*Id.* at 30.) There was significant damage to Wallace's truck from the explosion. (*Id.* at 33–35.) Wallace testified that "there was about a three-inch hole in the cast iron block" that needed to be replaced, the engine and tires needed to be replaced, and the fenders, hood, and radiators had damage. (*Id.* at 34–35.)

Special Agent Roger Martin with the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that a pipe bomb was placed on "the passenger front fender well" of Wallace's truck. (ECF No. 77-1 at 56, 70–71.) Special Agent Martin testified that video surveillance showed

---

[8] Duarte-Herrera was tried alone in the Home Depot trial.

1  "a vehicle pull in across from Mr. Wallace's" truck the night of the explosion. (ECF No. 77-2 at

2  2–3, 5.)  That vehicle was parked near Wallace's truck for four to five minutes. (*Id.* at 5.)  The

3  explosion took place 15 minutes later and sent "fragments throughout the whole parking lot." (*Id.*

4  at 6, 37.)  Danny Waltenbaugh, an explosives specialist for the Bureau of Alcohol, Tobacco,

5  Firearms and Explosives, testified that the "extremely lethal" pipe bomb placed on Wallace's truck

6  consisted of, *inter alia*, "gunpowder, . . . an electrical igniter which would be a light bulb which

7  was attached to a nine[-]volt battery and a mechanical kitchen timer." (*Id.* at 39, 44, 51.)

8  Detective Luis Araujo with the Las Vegas Metropolitan Police Department testified

9  information led him to speak to Duarte-Herrera regarding the explosion. (ECF No. 78-1 at 6, 8.)

10  Duarte-Herrera told detectives that he placed a bomb on the passenger-side front tire of a black

11  truck in the Home Depot parking lot. (*Id.* at 17–18.)  Duarte-Herrera stated that "he worked in

12  electronics[,] and he just figured" out how to build the bomb. (*Id.* at 14–15.)  Duarte-Herrera

13  explained that he used a cream-colored kitchen timer, shotgun powder, batteries, and a wire to

14  make the bomb. (*Id.* at 15–16.)  Duarte-Herrera set the timer for 20 minute and watched the

15  explosion from a 7-Eleven store across the street. (*Id.* at 18–19.)

16  A jury found Duarte-Herrera guilty of attempted murder with the use of a deadly weapon,

17  manufacture and/or possession of an explosive or incendiary device, malicious destruction of

18  private property, and possession of an explosive or incendiary device during the commission of a

19  felony for the Home Depot bombing. (ECF No. 78-4.)  Duarte-Herrera's conviction for possession

20  of an explosive or incendiary device during the commission of a felony was overturned on direct

21  appeal as redundant to the conviction for attempted murder with the use of a dangerous weapon.

22  (ECF No. 56-4 at 6–8.) The Nevada Supreme Court affirmed the remainder of Duarte-Herrera's

23  judgment of conviction. (*Id.*)

## II.      GOVERNING STANDARDS OF REVIEW

### A.      Antiterrorism and Effective Death Penalty Act ("AEDPA")

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

### B.   Effective assistance of counsel

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984).  A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). And "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

## III.   DISCUSSION OF GROUNDS RELATING TO THE LUXOR BOMBING

### A.   Ground 1—disclosure of confidential informant

In ground 1, Duarte-Herrera alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the state district court violated his right to present evidence by denying disclosure of the identity of a confidential informant who had information about his co-defendant, Rueda-Denvers. (ECF No. 64 at 31.) Duarte-Herrera explains that this evidence was relevant to prove that Rueda-Denvers committed the bombing alone and to disprove Rueda-Denvers' claim that he had no knowledge of how to make a bomb. (*Id.*)

#### 1.   Background information

According to a May 2007 report, a narcotics confidential informant told a narcotics detective, *inter alia*: (1) the informant personally knew Rueda-Denvers in Guatemala by the name of Caesar Augusto Chinchilla; (2) Rueda-Denvers worked as an associate with and armed bodyguard for Manuel Carrillo, an alleged high level weapons and drug trafficker in Central and South America; (3) the informant heard Rueda-Denvers speak to Carrillo on several occasions regarding moving weapons from Guatemala to Honduras; (4) Rueda-Denvers originally was from Nicaragua and went from there to Columbia where he trained with and learned weapons and

explosives from the Revolutionary Armed Forces of Columbia, or FARC, allegedly identified by the State Department as a terrorist organization; (5) he heard Rueda-Denvers speaking in 1997-1998 with "Arana," an alleged known drug and weapons trafficker in Guatemala and Central America about explosives, blowing up bridges, and FARC soldiers and commanders that they both knew; and (6) Rueda-Denvers left Guatemala for the United States because he blew up a vehicle with a load of narcotics and feared for his life. (ECF No. 40-3 at 2–3.)  Nothing in the report reflects whether and how the informant had personal knowledge of the points in items (4) and (6) in the summary above.

On the first day of trial, Duarte-Herrera requested that the state district court order the State to identify the informant so that Duarte-Herrera could use his testimony to establish that Rueda-Denvers had the knowledge and capability to build a bomb in support of a defense argument that Rueda-Denvers acted alone. (ECF No. 48-4 at 4–5.)  Duarte-Herrera explained that he wanted to get the informant's name, talk to him, and "verify the accuracy of the report itself." (*Id.* at 11.) The trial court denied Duarte-Herrera's requests, noting, *inter alia*: (1) the narcotics informant was not a confidential informant or percipient witness for the Luxor bombing; (2) nothing indicated that he had any knowledge regarding the allegations in the Luxor Bombing charges; and (3) the alleged conversation regarding explosives and blowing up bridges would have occurred more than ten years before the Luxor bombing.  (*Id.* at 12.)

Later, on the eighth day of trial, Duarte-Herrera argued that Rueda-Denvers opened the door to the information from the confidential informant by eliciting testimony from a detective that Rueda-Denvers had never seen a bomb before. (ECF No. 52-1 at 5–6.)  Duarte-Herrera argued that he should be able to inquire into the detective's investigation regarding the May 2007 report.

1    (*Id.* at 6.)  The state district court ruled that the door had not "been opened in that regard, so [it

2    was] continuing to exclude that area of inquiry and evidence." (*Id.* at 9.)

3                          **2.      State court determination**

4          In affirming Duarte-Herrera's judgment of conviction, the Nevada Supreme Court held:

5                Duarte-Herrera contends that the district court violated his right to present
       a defense by refusing to order the disclosure of the identity of a confidential
6       informant who had provided information about Duarte-Herrera's codefendant,
       Omar Rueda-Denvers. We conclude that the district court's conclusion that the
7       confidential informant was not a material witness in the case is supported by the
       record. *See Sheriff v. Vasile*, 96 Nev. 5, 8, 604 P.2d 809, 810 (1980) ("The identity
8       of an informant need not be disclosed where he is not a material witness, because
       he can neither supply information constituting a defense nor rebut a necessary
9       element of an offense."). The informant did not participate in the events giving rise
       to the criminal charge. The record indicates that the informant's knowledge of
10      Rueda-Denvers comes solely from a conversation he overheard regarding
       explosives that involved Rueda-Denvers and occurred ten years prior to the instant
11      crime. While the evidence suggests that Rueda-Denvers is familiar with some
       explosives, the informant's testimony is not necessary to a "fair determination of
12      guilt or innocence" where Duarte-Herrera admitted to detectives that he constructed
       the explosive. *See* NRS 49.365; *Vasile*, 96 Nev. at 8, 604 P.2d 810.

13

14   (ECF No. 55-7 at 2–3.)

15                          **3.      Conclusion**

16         The sole Supreme Court decision relied upon by Duarte-Herrera is *Roviaro v. United*

17   *States*, 353 U.S. 53 (1957). (*See* ECF Nos. 64 at 32–34; 98 at 2–4.)  In *Roviaro*, the Supreme Court

18   set the standards for determining whether the disclosure of an informant's identity is required.

19   Importantly, the Court rejected any "fixed rule" and instead fashioned a broad test that "balanc[es]

20   the public interest in protecting the flow of information against the individual's right to prepare

21   his defense." *Roviaro*, 353 U.S. at 62.

22         In this case, the confidential informant had information that Rueda-Denvers was

23   knowledgeable about explosives and had previously "bl[own] up a vehicle" (ECF No. 40-3 at 2–

3), which would have been beneficial evidence—if it was determined to be admissible, which was unlikely given the state district court's ruling on the eighth day of trial—for Duarte-Herrera's defense that Rueda-Denvers made and placed the bomb—notwithstanding Duarte-Herrera's confession that he made and placed the bomb.  However, the Nevada Supreme Court reasonably determined that the confidential informant did not amount to a material witness because he did not participate in, witness, or have knowledge about the Luxor bombing.  Consequently, considering Duarte-Herrera's minimal showing of relevance, Duarte-Herrera fails to demonstrate that the Nevada Supreme Court's affirmation of the state district court's determination disallowing the disclosure constituted an unreasonable applicable of *Roviaro*'s balancing test.

Further, Duarte-Herrera fails to demonstrate that this determination was materially indistinguishable from, and therefore contrary to, *Roviaro* where the confidential informant was the sole participant in the crime other than the accused and the only witness who could amplify or contradict the testimony of government witnesses. 353 U.S. at 64–65.  Accordingly, the Nevada Supreme Court's denial of Duarte-Herrera's claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.  Duarte-Herrera is not entitled to federal habeas relief for ground 1.

### B.   Ground 2—jury instructions

In ground 2, Duarte-Herrera alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the state district court overruled his objections to four jury instructions—Jury Instruction Nos. 14, 15, 19, and 20—and denied his proffered instructions in lieu of those instructions. (ECF No. 64 at 34.)

//

//

1        **1.      Background information**

2            **a.      Jury Instruction Nos. 14 and 15**

3        Jury Instruction No. 14 provided:

4            The prosecution is not required to present direct evidence of a defendant's
         state of mind as it existed during the commission of a crime and the jury may infer
5            the existence of a particular state of mind of a party or a witness from the
         circumstances disclosed by the evidence.

6

7    (ECF No. 53-2 at 17.)  Relatedly, Jury Instruction No. 15 provided:

8            The intention to kill may be ascertained or deduced from the facts and
         circumstances of the killing, such as the use of a weapon calculated to produce
9            death, the manner of its use, and the attendant circumstances characterizing the act.

10    (*Id.* at 18.)

11        Duarte-Herrera joined Rueda-Denvers' objection to Jury Instruction Nos. 14 and 15,

12    arguing that they "relieve[d] the State of their burden of proof." (ECF No. 52-1 at 151.)  Duarte-

13    Herrera also argued that Jury Instruction No. 14 was "misleading and confusing in that the jury

14    could easily interpret it to mean that the State [was] not obligated to prove the mens rea element

15    of the offense." (ECF No. 50-2 at 5.)  Duarte-Herrera alternatively requested that if Jury Instruction

16    No. 14 was given, it should include the following provision: "The State, however, must prove

17    beyond a reasonable doubt that each Defendant had the mental state required for each of the

18    offenses charged." (*Id.*)  The state district court overruled the objection, ruling that the original

19    forms of Jury Instruction Nos. 14 and 15 were "a correct statement of the law." (ECF No. 52-1 at

20    152.)

21            **b.      Jury Instruction No. 19**

22        Jury Instruction No. 19 provided:

23

> Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill.
>
> It is not necessary to prove the elements of premeditation and deliberation in order to prove attempted murder.

(ECF No. 53-2 at 22.)  Duarte-Herrera objected to the second paragraph of Jury Instruction No. 19 because it "relieve[d] the State of its burden of proving each of the elements of the offense, [was] confusing and misleading, and there [was] contradictory Nevada precedent on the issue." (ECF No. 50-2 at 6.)  The state district court gave Jury Instruction No. 19 as originally drafted. (*See* ECF No. 53-2 at 22.)

### c.     Jury Instruction No. 20

Jury Instruction No. 20 provided: "The elements of an attempt to commit a crime are: 1) the intent to commit the crime; 2) performance of some act towards its commission; and (3) failure to consummate its commission." (ECF No. 53-2 at 23.)  Duarte-Herrera appears to argue that his proffered instruction on transferred intent should have been in place of Jury Instruction No. 20. (ECF Nos. 64 at 36–37; 98 at 7.)   Duarte-Herrera's proffered transferred intent instruction provided:

> The doctrine of transferred intent is applicable to all crimes where an unintended victim is harmed as a result of the specific intent to harm an intended victim whether or not the intended victim is injured. If the unintended victim is not harmed, you must return a verdict of not guilty as to that charge.

(ECF No. 51-2 at 4.)  The state district court did not give Duarte-Herrera's transferred intent jury instruction. (*See* ECF No. 53-2.)

### 2.     State court determination

In affirming Duarte-Herrera's judgment of conviction, the Nevada Supreme Court held:

> Duarte-Herrera contends that the district court abused its discretion in instructing the jury concerning the proof required of his state of mind at the time of

the crime and refusing to give his proffered instruction concerning reasonable doubt as to his state of mind. We discern no abuse of discretion. *See Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005) (reviewing district court's decision regarding jury instructions for abuse of discretion). The given instructions were legally correct and did not impermissibly reduce the burden of proof. *See Sharma v. State*, 118 Nev. 648, 659, 56 P.3d 868, 874 (2002) (observing that "intent can rarely be proven by direct evidence of a defendant's state of mind, but instead is inferred by the jury from the individualized, external circumstances of the crime, which are capable of proof at trial"); *Keys v. State*, 104 Nev. 736 740-41, 766 P.2d 270, 273 (1988) (providing that State need not prove premeditation or deliberation to prove attempted murder); *Moser v. State*, 91 Nev. 809, 812, 544 P.2d 424, 426 (1975) ("[T]he intention to kill may be ascertained or deduced from the facts and circumstances of the killing, such as the use of a weapon calculated to produce death, the manner of use, and the attendant circumstances characterizing the act."). Further, the subject matter of the proffered instruction was substantially covered by the given instructions. *See Earl v. State*, 111 Nev. 1304, 1308, 904 P.2d 1029, 1031 (1995). The district court instructed the jury that the State bore the burden of proof and gave the statutory reasonable doubt instruction. *See* NRS 175.211.

(ECF No. 55-7 at 3–4.)

### 3.    Standard for evaluating jury instructions

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error.").  The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)). And significantly, when reviewing a jury instruction, this court considers that jury instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72; *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions,

the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation.").

### 4.   Conclusion

#### a.   Jury Instruction Nos. 14 and 15

As the Nevada Supreme Court, the final arbiter of Nevada law, reasonably determined, Jury Instruction Nos. 14 and 15 were accurate reflections of Nevada law. *See Sharma v. State*, 118 Nev. 648, 659, 56 P.3d 868, 874 (2002) ("[I]ntent can rarely be proven by direct evidence of a defendant's state of mind, but instead is inferred by the jury from the individualized, external circumstances of the crime, which are capable of proof at trial."); *Moser v. State*, 91 Nev. 809, 812, 544 P.2d 424, 426 (1975) ("[T]he intention to kill may be ascertained or deduced from the facts and circumstances of the killing, such as the use of a weapon calculated to produce death, the manner of the use, and the attendant circumstances characterizing the act."). And Duarte-Herrera fails to articulate how Jury Instruction Nos. 14 and 15 relieved the State of its burden of proof. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). Indeed, as the Nevada Supreme Court reasonably noted, Jury Instruction No. 6 provided that "the State [has] the burden of proof beyond a reasonable doubt every material element of the crime charged." (ECF No. 53-2 at 9.) Furthermore, Jury Instructions No. 14 and 15 simply provided that the State did not have to present direct evidence of his state of mind; they did not relieve the State of its burden of presenting evidence altogether. Therefore, Duarte-Herrera fails to demonstrate that Jury Instruction Nos. 14 and 15 were erroneous and violated his right to due process. *Estelle,* 502 U.S. at 72.

//

### b.   Jury Instruction No. 19

Like Jury Instructions No. 14 and 15, Jury Instruction No. 19 is an accurate reflection of Nevada law, as reasonably determined by the Nevada Supreme Court, the final arbiter of Nevada law. *See Keys v. State*, 104 Nev. 736, 740–41, 766 P.2d 270, 273 (1988) ("Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill. This is all there is to it. There is no need for the prosecution to prove any additional elements, such as, say premeditation and deliberation.").  And like Jury Instructions No. 14 and 15, Duarte-Herrera fails to articulate how Jury Instruction No. 19 relieved the State of their burden of proof. *See In re Winship*, 397 U.S. at 364.  Rather, the second paragraph of Jury Instruction No. 19 merely stated what elements were not included in the crime of attempted murder.  Thus, Duarte-Herrera fails to demonstrate that Jury Instruction No. 19 was erroneous and violated his right to due process. *Estelle,* 502 U.S. at 72.

### c.   Jury Instruction No. 20

Jury Instruction No. 20 provided, in relevant part, that an element of attempted murder is "the intent to commit the crime." (ECF No. 53-2 at 23.)   Duarte-Herrera contends that an instruction on transferred intent was needed instead. (*See* ECF No. 51-2 at 4.)  "[T]he doctrine of transferred intent is applicable to all crimes where an unintended victim is harmed as a result of the specific intent to harm an intended victim whether or not the intended victim is injured." *See Ochoa v. State*, 115 Nev. 194, 200, 981 P.2d 1201, 1205 (1999).  Because a transferred intent instruction was only applicable regarding the attempted murder of Chali if Chali was considered an unintended victim, which is not supported by the record as discussed further in ground 3, the Nevada Supreme Court reasonably determined that the subject matter concerning intent necessary

to support a conviction for attempted murder was covered by the given instructions.  As such, Duarte-Herrera fails to demonstrate that Jury Instruction No. 20 was erroneously given instead of his proffered instruction such that his right to due process was violated. *Estelle,* 502 U.S. at 72.

Because the Nevada Supreme Court's denial of Duarte-Herrera's jury instruction claims was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, Duarte-Herrera is not entitled to federal habeas relief for ground 2.

### C.    Ground 3—insufficient evidence for attempted murder

In ground 3, Duarte-Herrera alleges that his Fifth, Sixth, and Fourteenth Amendments rights were violated because there was insufficient evidence to convict him of attempted murder. (ECF No. 64 at 37.)  Duarte-Herrera's claim is based on the alleged lack of evidence that he intended to kill Chali or even knew that a passenger would be present when the bomb exploded. (*Id.* at 38.)

#### 1.    State court determination

In affirming Duarte-Herrera's judgment of conviction, the Nevada Supreme Court held:

> Duarte-Herrera argues that there was insufficient evidence of attempted murder as there was no evidence that he intended to kill Caren Chali. This claim lacks merit because the evidence, when viewed in the light most favorable to the State, is sufficient to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). The jury heard evidence that Rueda-Denvers had a falling out with his current girlfriend, Rosa Alfonso, and former girlfriend, Chali, when Chali arrived in Las Vegas. Rueda-Denvers acknowledged he was also aware that Chali had begun dating the victim, Willebaldo Dorantes Antonio. Duarte-Herrera admitted to police that he constructed a bomb and disguised it in a coffee cup. He and Rueda-Denvers travelled to the Luxor casino parking garage and planted the bomb on Antonio's car. Based on this evidence, particularly the evidence of motive and nature of the weapon used, we conclude that a rational juror could reasonably find that Duarte-Herrera deliberately intended to take Chali's life. *See* NRS 193.200 (intent); NRS 193.330(1) (defining attempt); NRS 200.020(1) (defining express malice); NRS 200.030 (murder); *Sharma*, 118

1   Nev. at 659, 56 P.3d at 874 (intent is generally inferred from the circumstances of
2   the crime that are capable of proof at trial).

3   (ECF No. 55-7 at 4.)

4       **2.      Standard for evaluating the sufficiency of the evidence**

5       "[T]he Due Process Clause protects the accused against conviction except upon proof

6   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

7   charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A federal habeas petitioner "faces a heavy

8   burden when challenging the sufficiency of the evidence used to obtain a state conviction on

9   federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  On direct

10  review of a sufficiency of the evidence claim, a state court must determine whether "any rational

11  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

12  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The evidence is to be viewed "in the light most

13  favorable to the prosecution." *See id*.  Federal habeas relief is available only if the state-court

14  determination that the evidence was sufficient to support a conviction was an "objectively

15  unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

16      **3.      Applicable state law**

17      Sufficiency of the evidence claims are judged by the elements defined by state law.

18  *Jackson*, 443 U.S. at 324 n.16.  Nevada law provides that "[a]n act done with the intent to commit

19  a crime, and tending but failing to accomplish it, is an attempt to commit that crime." Nev. Rev.

20  Stat. § 193.330(1).  And an attempt to commit murder "can only be committed with express

21  malice." *Sharma v. State*, 118 Nev. 648, 652, 56 P.3d 868, 870 (2002); *see also Keys v. State*, 104

22  Nev. 736, 740, 766 P.2d 270, 273 (1988) ("Attempted murder is the performance of an act or acts

23  which tend, but fail, to kill a human being, when such acts are done with express malice, namely,

with the deliberate intention unlawfully to kill."); Nev. Rev. Stat. § 200.010(1) ("Murder is the unlawful killing of a human being.").  "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." Nev. Rev. Stat. § 200.020(1); *see also Dearman v. State*, 93 Nev. 364, 367, 566 P.2d 407, 409 (1977) ("Intent to kill, as well as premeditation, may be ascertained or deduced from the facts and circumstances of the killing, such as use of a weapon calculated to produce death, the manner of use, and the attendant circumstances."); Nev. Rev. Stat. § 193.200 ("Intention is manifested by the circumstances connected with the perpetration of the offense.").

### 4.    Conclusion

It is true that Duarte-Herrera never met Chali. (ECF No. 42-4 at 48–49; *see also* ECF No. 51 at 170.)  And it is also true that Danny Waltenbaugh, an explosives specialist for the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified that the bomb "wasn't in the middle [of the vehicle's roof] where a person from the passenger . . . side would have naturally reached for it." (ECF No. 52 at 14, 83.)

However, there was evidence that (1) Rueda-Denvers felt rejected by Chali, (2) Rueda-Denvers knew Chali's work schedule and knew from his stalking that Dorantes would give Chali rides home from work, (3) Rueda-Denvers and Duarte-Herrera were "very good friends," and (4) Duarte-Herrera admitted to constructing and placing the bomb. (ECF Nos. 42-4 at 21; 51 at 179, 187; 52 at 147, 178, 181, 183; 52-1 at 41.)  And regarding the placement of the bomb, Waltenbaugh also testified that bomb's "explosion force" was "more to the sides," the bomb was made with metal pipes and end caps which were "thrown in all directions" during the explosion, a piece of the pipe "ripped through the top of the vehicle . . . and . . . entered into the vehicle," and fragmentation from the explosion could have caused injuries within an approximate 300-foot

radius from the explosive device. (ECF No. 52 at 44–46, 50.)  And Hansen, Duarte-Herrera's explosives expert, testified that he "would certainly consider that [Chali] . . .  would be in the danger zone" of the bomb and that she was not injured because of "pure luck," the vehicle's roof "deflect[ing] frag[mentation] above her head," and her short stature. (ECF No. 52-1 at 130.) Viewing this evidence "in the light most favorable to the prosecution" (*Jackson*, 443 U.S. at 319), the Nevada Supreme Court reasonably determined that a rational trier of fact could have found beyond a reasonable doubt that Duarte-Herrera acted with an intention to kill Chali. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; Nev. Rev. Stat. § 200.020(1).  Accordingly, the Nevada Supreme Court's denial of Duarte-Herrera's claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.  Duarte-Herrera is not entitled to federal habeas relief for ground 3.

### D.  Grounds 4 and 8—joinder of defendants

In ground 4, Duarte-Herrera argues that his Fifth, Sixth, and Fourteen Amendment rights were violated when the state district court refused to sever his trial from Rueda-Denvers' trial. (ECF No. 64 at 39.)  Duarte-Herrera argues that he was prejudiced by the misjoinder because Rueda-Denvers' statements implicated him, he suffered from media spillover demonizing Rueda-Denvers, he was unable to cross-examine Rueda-Denvers, and Rueda-Denvers' counsel acted as a second prosecutor. (*Id.* at 42.)  Relatedly, in ground 8, Duarte-Herrera argues that his Sixth and Fourteen Amendment rights were violated when his appellate counsel failed to raise the severance issue in his direct appeal. (*Id.* at 45.)

#### 1.  Background information

Prior to trial, Duarte-Herrera moved—and later reiterated his motion—to sever his trial from Rueda-Denvers' trial. (ECF Nos. 44-3; 47-1.)  The state district court denied the requests.

1   (ECF Nos. 47-5; 48-2 at 18; 49-2.)    Duarte-Herrera and Rueda-Denvers each sought

2   reconsideration throughout the trial, but the state district court adhered to its rulings. (*See, e.g.,*

3   ECF Nos. 51 at 174; 52 at 145.)

4            **2.      State court determination**

5        In affirming the denial of Duarte-Herrera's state habeas petition, the Nevada Supreme

6   Court held:

> Second, appellant contends that the district court erred by denying his claim
> that appellant counsel was ineffective for failing to challenge the denial of his
> motion for severance. Appellant also contends that the district court should have
> held an evidentiary hearing on this claim. We disagree. Appellant does not point to
> the portion of the record where his codefendant's statements were admitted without
> being subject to cross-examination, where he was prevented from presenting
> evidence that would have been admissible in a separate trial, or where a specific
> trial right was violated. *See Chartier v. State*, 124 Nev. 760, 765, 191 P.3d 1182,
> 1185 (2008). Appellant also fails to demonstrate that any prejudice resulted from
> the joint trial. *See id.* We conclude that no relief is warranted on this claim.

13  (ECF No. 59-4 at 3.)[9]

14           **3.      Conclusion**

15       In the context of joinder of federal defendants, the Supreme Court has stated: "Improper

16  joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a

17  constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth

18  Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 466 n.8 (1986); *see also*

19  *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (holding that a court should grant a severance

20  under Federal Rule of Criminal Procedure 14 "only if there is a serious risk that a joint trial would

21  compromise a specific trial right of one of the defendants, or prevent the jury from making a

22

23  [9] The respondents previously moved to dismiss ground 4 based on procedural default grounds, but
    this court disagreed, determining that the "substantive claim was fairly presented to the Nevada
    Supreme Court." (ECF No. 83 at 6.)

1   reliable judgment about guilt or innocence").  The Ninth Circuit has declared this comment in *Lane*

2   to be dicta and held that "neither *Zafiro v. United States* nor *United State v. Lane* establish a

3   constitutional standard binding on the state requiring severance in cases where defendants present

4   mutually antagonistic defense." *See Collins v. Runnels*, 603 F.3d 1127, 1132–33 (9th Cir. 2010);

5   *see also Runningeagle v. Ryan*, 686 F.3d 758, 774 (9th Cir. 2012) ("[T]here is no clearly

6   established federal law requiring severance of criminal trials in state court even when the

7   defendants assert mutually antagonistic defenses.").  Therefore, because there is no applicable

8   clearly established Supreme Court precedent, Duarte-Herrera has not shown that the Nevada

9   Supreme Court acted contrary to Supreme Court precedent in determining that he was not entitled

10  to relief on his severance claim. *See* 28 U.S.C. § 2254(d)(1); *see also Wright v. Van Patten*, 552

11  U.S. 120, 126 (2008) (explaining that "it cannot be said that the state court unreasonably applied

12  clearly established Federal law" when United States Supreme Court precedent "give[s] no clear

13  answer to the question presented" (internal quotation marks and alterations omitted)).

14      And regarding Duarte-Herrera's related argument that he was prejudiced by the misjoinder

15  because Rueda-Denvers' statements implicated him, *Bruton v. United States* provides that the

16  admission in a joint trial of a non-testifying co-defendant's out-of-court statement that inculpates

17  the defendant violates the defendant's right of cross-examination guaranteed by the Sixth

18  Amendment's Confrontation Clause. 391 U.S. 123, 126 (1968).  However, Duarte-Herrera fails to

19  point to the portion of the record where Rueda-Denvers' admitted, out-of-court statements

20  allegedly inculpated him.  And this court's review of the record does not support Duarte-Herrera's

21  contention that there was a *Bruton* error.[10]

22

23  _____

[10] Detective Dean O'Kelley testified that he interviewed Rueda-Denvers on May 10, 2007, and May 14, 2007. (ECF No. 52 at 110, 112–13.)  Detective O'Kelley testified on direct examination about Rueda-Denvers' statements during those interviews and did not mention Duarte-Herrera.[10]

And turning to Duarte-Herrera's ineffective-assistance-of-appellate-counsel claim, because the Nevada Supreme Court determined that Duarte-Herrera "fail[ed] to demonstrate any prejudice resulted from the joint trial" during Duarte-Herrera's post-conviction proceedings, Duarte-Herrera fails to demonstrate "a reasonable probability that, but for his [appellate] counsel's [alleged] unreasonable failure to" include a misjoinder ground in his direct appeal, "he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000); Nev. Rev. Stat. § 174.165(1) ("If it appears that a defendant . . . is prejudiced by a joinder of . . . defendants in an indictment or information, or by such joinder for trial together, the court may . . . grant a severance of defendants."). Accordingly, the Nevada Supreme Court's denial of Duarte-Herrera's ineffective-assistance-of-appellate-counsel claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.

Duarte-Herrera is not entitled to federal habeas relief for grounds 4 and 8.

### E.   Ground 5—counsel's alleged failure to suppress the confession

In ground 5, Duarte-Herrera argues that his Fifth, Sixth, and Fourteen Amendment rights were violated when counsel failed to move to suppress his interview statements on grounds that those statements were coerced and obtained under extreme duress. (ECF No. 64 at 42.)

//

---

(*See id.* at 149–185, 187–197.) The only apparent mention of Duarte-Herrera came during Rueda-Denvers' counsel's cross-examination, where Detective O'Kelley answered in the affirmative when asked if Rueda-Denvers stated that he drove to Duarte-Herrera's residence on the night in question following his initial observance of Dorantes' vehicle at the Luxor parking garage. (*Id.* at 229–230). Moreover, Detective O'Kelley's testimony about Rueda-Denvers' statement even appeared to exculpate Duarte-Herrera at one point. When Rueda-Denvers was confronted with "the fact that on the video [Detective O'Kelley] saw the Chevy Cobalt stop next to the victim's car," Detective O'Kelley testified that Rueda-Denvers replied: "I looked to see if they were there. They were still there, then I left, I returned and I saw that they were there, then I came over to wait for them to come out like I always did, but I've always done it alone." (ECF No. 52 at 180–81.)

### 1.    State court determination

In affirming the denial of Duarte-Herrera's state habeas petition, the Nevada Supreme Court held:

> First, appellant contends that the district court erred by denying his claim that trial counsel were ineffective for failing to file a motion to suppress his statements to law enforcement. Appellant also contends that the district court should have held an evidentiary hearing on this claim. We disagree. Although appellant asserts that law enforcement threatened to deport his family unless he confessed, he does not assert that he told counsel about the threats and therefore did not allege sufficient facts to entitle him to relief or an evidentiary hearing. *See Hargrove v. State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984). Moreover, appellant does not explain how suppressing his statements would have changed the outcome at trial. We conclude that no relief is warranted on this claim.

(ECF No. 59-4 at 2–3.)

### 2.    Conclusion

The admission into evidence at trial of an involuntary statement violates a defendant's right to due process under the Fourteenth Amendment. *Lego v. Twomey*, 404 U.S. 477, 478 (1972); *Jackson v. Denno*, 378 U.S. 368, 376 (1964) ("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession").  However, as the Nevada Supreme Court reasonably determined, Duarte-Herrera failed—and still fails—to assert that counsel was aware of the alleged threats warranting an argument that his statements were involuntary. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("[C]ounsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." (quoting *Matthews v. Evatt*, 105 F.3d 907, 920 (4th Cir. 1997), *abrogated on other grounds by Miller-El v. Dretke*, 545 U.S. 231 (2005)).  Duarte-Herrera contends that his false confession was "induced by threats of deportation of [his] family" (ECF No. 64 at 44), but his transcribed law

enforcement interviews from May 7, 2007, and May 14, 2007, do not mention deportation. (*See* ECF Nos. 40-1, 40-2.)  Consequently, Duarte-Herrera fails to establish that counsel overlooked the need to move to suppress his statements. *See Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) ("[P]etitioner must show that (1) the overlooked motion to suppress would have been meritorious and (2) there is a reasonable probability that the jury would have reached a different verdict absent the introduction of the unlawful evidence.").  Accordingly, the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s performance prong. 466 U.S. at 688. Duarte-Herrera is not entitled to federal habeas relief for ground 5.

### F.   Ground 9—counsel's alleged failure to investigate innocence

In ground 9, Duarte-Herrera alleges that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments when counsel failed to investigate actual innocence. (ECF No. 64 at 47–49.)

#### 1.   Background of the claim

This court previously held that this ground was not exhausted and was procedurally defaulted, subject to Duarte-Herrera seeking to overcome that procedural default pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). (ECF No. 83 at 7.)  This court deferred consideration of that issue "until the time of the merits determination." (*Id.*)

Generally, to overcome a procedural default based upon the actual or projected application of an adequate and independent state law procedural bar, a federal petitioner must show: (a) cause for the procedural default and actual prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of justice will result in the absence of review, based on a sufficient showing of actual factual innocence. *E.g., Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).

27

Under *Martinez*, in the specific context pertinent to this case, a petitioner can demonstrate cause to potentially overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that either: (a) he had no counsel in the state postconviction proceeding in the state district court; or (b) such counsel was ineffective under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984).  To establish such ineffective assistance of state postconviction counsel, a petitioner must demonstrate that: (a) postconviction counsel provided deficient performance in failing to present the claim of ineffective assistance of trial counsel; and (b) there was a reasonable probability that the result of the postconviction proceeding would have been different if counsel instead had raised the claim. *E.g., Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019).

To demonstrate "prejudice" under *Martinez*, the petitioner must show that the defaulted claim of ineffective assistance of trial counsel is a "substantial" claim.  A claim is "substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that would warrant issuance of a certificate of appealability. *Id.*  In pertinent part, a claim would warrant issuance of a certificate of appealability, and thus is "substantial" for purposes of *Martinez*, if reasonable jurists could debate the proper disposition of the claim or the issue presented is adequate to deserve encouragement to proceed further.  This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *Id. See generally Miller-El v. Cockrell*, 537 US. 322, 336–38 (2003).  In cases where the petitioner was represented by state postconviction counsel, there is substantial overlap between these criteria for both cause and prejudice under *Martinez* because the criteria all ultimately turn upon the strength or weakness of the underlying claim of ineffective assistance of trial counsel. *See Ramirez*, 937 F.3d at 1241–42; *Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017).

The determination of whether Duarte-Herrera can overcome the procedural default of ground 9 is made *de novo*. *E.g., Ramirez*, 937 F.3d at 1243–44; *see also Visciotti v. Martel*, 862 F.3d 749, 768–69 (9th Cir. 2017).  If he does so, the claim then is reviewed *de novo* on the merits. *E.g., Rodney v. Filson*, 916 F.3d 1254, 1258, 1262 (9th Cir. 2019); *Atwood*, 870 F.3d at 1060 n.22; *Dickins v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (*en banc*).

### 2.    Factual basis of claim

Duarte-Herrera relies on an affidavit executed by Rueda-Denvers two-and-a-half years after the Luxor bombing trial. (*See* ECF No. 56-5.)  In the affidavit, Rueda-Denvers attests, *inter alia*, that: (a) Duarte-Herrera did not give him a bomb or any bombmaking materials; (b) the two never entered the Luxor parking garage together; (c) the two did not attempt to kill Chali; (d) Duarte-Herrera did not place a cup pipe bomb on the roof of Dorantes' vehicle; (e) Rueda-Denvers possessed a key to Duarte-Herrera's home between December 20, 2006, through May 10, 2007; and (f) Rueda-Denvers was manipulated and coerced by detectives into making false statements when interrogated on May 14, 2007. (*Id.*)

### 3.    Conclusion

In the present case, Duarte-Herrera had appointed counsel during the litigation of his state postconviction petition. (*See* ECF No. 58.)  To satisfy *Martinez*, Duarte-Herrera therefore must establish, under the foregoing overlapping criteria, ineffective assistance of postconviction counsel to establish cause as well as that ground 9 is a substantial claim in order to establish prejudice. Duarte-Herrera cannot establish either ineffective assistance of postconviction counsel in failing to raise ground 9 or that ground 9 is a substantial claim.

The underlying claim of ineffective assistance of counsel is nonsensical.  Ground 9 is a claim that trial counsel failed to investigate Duarte-Herrera's actual innocence in order to develop

statements made by Rueda-Denvers *two-and-a-half years after the trial*.  Duarte-Herrera fails to articulate how trial counsel could have investigated, uncovered or developed such statements at the time of the trial. Duarte-Herrera's counsel ethically could not even talk to Rueda-Denvers except with his counsel's permission and with Rueda-Denvers' counsel then most assuredly being present.  At the time of the trial, both codefendants, through their respective counsel, very clearly pursued a strategy of trying to exculpate themselves by inculpating each other.  Ground 9, at bottom, inherently proceeds on the unrealistic premise that if Duarte-Herrera's counsel had asked Rueda-Denvers' counsel for statements from Rueda-Denvers along the lines of the affidavit before trial, such statements would have been provided.  There was no probability that Rueda-Denvers would have abandoned his trial strategy by providing such statements, much less taken the stand to provide such testimony, if Duarte-Herrera's counsel had made the inquiries Duarte-Herrera argues he should have made.

Ground 9, the underlying claim of ineffective assistance of counsel, thus lacks merit.  On *Strickland*'s performance prong, trial counsel's performance is assessed from counsel's perspective *at the time of the trial*. *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to . . . evaluate the conduct from counsel's perspective at the time.")  Indisputably, trial counsel did not provide deficient performance by failing to investigate or try to secure exculpatory statements and testimony from a codefendant (a) who he ethically could not talk to in the first instance without the consent of his counsel, and (b) who at the relevant time clearly was trying to inculpate rather than exculpate his client.  There is also not a reasonable probability that such a quixotic effort would have led to a different outcome at trial.

1   Ground 9 is a baseless claim.  State postconviction counsel did not provide ineffective

2   assistance in failing to raise such a baseless claim, and ground 9 is not a substantial claim for

3   purposes of *Martinez*.  Ground 9 is therefore procedurally defaulted and does not provide a basis

4   for federal habeas relief.[11]

5   ## G.   Ground 10—cumulative error

6   In ground 10, Duarte-Herrera alleges that his Fifth, Sixth, and Fourteenth Amendments

7   rights were violated due to cumulative error. (ECF No. 64 at 49.)  This court previously held that

8   ground 10 was procedurally defaulted and dismissed "to the extent it relies on claims of substantive

9   trial court error and ineffective assistance of appellate counsel." (ECF No. 83 at 11.)  This court

10  then deferred "consideration of cause and prejudice of the cumulative errors of any viable

11  ineffective assistance of trial counsel claims until the merits determination." (*Id.*)

12  Cumulative error applies where, "although no single trial error examined in isolation is

13  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

14  prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also*

15  *Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess

16

17

---

18  [11] Duarte-Herrera relies on *Schlup v. Delp*, 513 U.S. 298 (1995) in his reply. (*See* ECF No. 98 at
    14.)  *Schlup* would be relevant to the procedural default issue at hand, but in his opposition to the

19  motion to dismiss, Duarte-Herrera relied exclusively on *Martinez*. (ECF No. 81.)  The time for
    Duarte-Herrera to rely on *Schlup* as a basis for overcoming the procedural default was in opposing

20  the motion to dismiss.  Duarte-Herrera cannot argue *Martinez* in his opposition to the motion to
    dismiss and then come back with a non-*Martinez* argument to overcome the procedural default in

21  his reply.  Regardless, Duarte-Herrera cannot satisfy the *Schlup* standard.  In the affidavit, Rueda-
    Denvers did not all accept sole responsibility while exonerating Duarte-Herrera.  Rueda-Denvers

22  just once again changed his story and sought to exonerate himself and Duarte-Herrera.  Such a
    self-serving affidavit by a convicted felon does not satisfy the rigorous *Schlup* standard and

23  establish that, had Rueda-Denvers' new story been presented at trial, together with the other
    evidence actually presented at that trial, no rational juror would have voted to convict Duarte-
    Herrera.

whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Because this court has determined that Duarte-Herrera failed to demonstrate that counsel acted deficiently in grounds 5 and 9, there are no errors to cumulate.  Accordingly, ground 10 is procedurally defaulted and does not provide a basis for federal habeas relief.

## IV.    DISCUSSION OF GROUNDS RELATING TO THE HOME DEPOT BOMBING

### A.    Ground 11—insufficient evidence for attempted murder

In ground 11, Duarte-Herrera alleges that his Fifth, Sixth, and Fourteenth Amendments rights were violated because there was insufficient evidence to convict him of attempted murder. (ECF No. 64 at 50.)  Duarte-Herrera's claim is based on the alleged lack of evidence that he acted with express malice and intended to kill Wallace or anyone else. (*Id.*)

### 1.    State court determination

In affirming, in part, and reversing, in part, Duarte-Herrera's judgment of conviction, the Nevada Supreme Court held:

> Appellant Porfirio Duarte-Herrera contends that insufficient evidence supported his conviction for attempted murder because the State failed to present any evidence that he had the specific intent to kill Ryan Wallace or anyone else. We review the evidence in the light most favorable to the prosecution and determine whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

> The jury heard testimony that Duarte-Herrera added shot taken from shotgun shells to his pipe-bomb to increase its lethality, used a timer to limit control over the bomb after it was activated, placed the bomb on Wallace's truck while it was parked at the Home Depot, and set the time to detonate the bomb during the store's business hours.

> We conclude that a rational juror could reasonably infer from this evidence that Duarte-Herrera specifically intended to kill. *See* NRS 193.200 (intent); NRS 193.330(1) (defining attempt); NRS 200.010 (defining murder); NRS 200.020(1) (defining express malice); *Sharma v. State*, 118 Nev. 648, 659, 56 P.3d 868, 874-

1
2
3
4

> 75 (2002) ("Intent to kill . . . may be ascertained or deduced from the facts and circumstances . . . such as use of a weapon calculated to produce death, the manner of use, and the attendant circumstances." (alteration and internal quotation marks omitted)). It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict. *See Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

5   (ECF No. 56-4 at 2–3.)

6   ### 2.   Conclusion[12]

7   It is true that Duarte-Herrera did not know Wallace. (ECF No. 77-1 at 38.)  However,

8   viewing the evidence "in the light most favorable to the prosecution" (*Jackson*, 443 U.S. at 319),

9   the Nevada Supreme Court reasonably determined that a rational trier of fact could have found

10   beyond a reasonable doubt that Duarte-Herrera acted with an intention to kill. *In re Winship*, 397

11   U.S. at 364; *Juan H.*, 408 F.3d at 1274; Nev. Rev. Stat. § 200.020(1).  Duarte-Herrera placed a

12   bomb on Wallace's truck in the Home Depot parking lot during business hours while customers

13   were in the parking lot. (ECF No. 77-1 at 30, 49; ECF No. 77-2 at 7.)  Explosive specialists

14   described that bomb as "extremely lethal," as including gun powder which would "cause an

15   extreme explosion and a significant amount of damage," and as being powerful enough to send

16   fragments traveling "about 3300 feet per second" throughout the entire parking lot. (ECF No. 77-

17   2 at 37, 48–49, 51.)  Explosive specialists also testified that surveillance showed Duarte-Herrera

18   leave the scene after depositing the bomb and that once the timer on the bomb was set, there was

19   no way to stop or control the device "other than physically walking up and doing something to it."

20   (*Id.* at 5–6, 51.)  Based on this evidence, the Nevada Supreme Court's denial of Duarte-Herrera's

21   claim was neither contrary to, nor an unreasonable application of, clearly established federal law

22

23

---

[12] This court will not repeat the applicable standards for reviewing a sufficiency-of-the-evidence claim or the applicable Nevada state law on attempted murder, which were discussed in ground 3.

1   and was not based on an unreasonable determination of the facts.  Duarte-Herrera is not entitled to

2   federal habeas relief for ground 11.

3       **B.      Ground 12—prohibition from questioning detectives**

4       In ground 12, Duarte-Herrera alleges that his Fifth, Sixth, and Fourteenth Amendment

5   rights were violated when the state district court prohibited him from questioning detectives about

6   the involuntary nature of his statements. (ECF No. 64 at 52.)  Duarte-Herrera elaborates that he

7   sought to question detectives about the length of his detention and multiple interviews which

8   would have shown that his will had been overborne, but the state district court disallowed this

9   questioning, ruling that it would open the door to the Luxor bombing case. (*Id.* at 53.)

10          **1.      Background information**

11      At the beginning of the trial, outside the presence of the jury, Duarte-Herrera's counsel

12  explained that Duarte-Herrera was interviewed multiple times by law enforcement "regarding both

13  incidences, the Luxor and the Home Depot" and stated he intended to reference those previous

14  interviews but did not want to "open the door" to the Luxor bombing case. (ECF No. 76-5 at 14.)

15  Counsel requested a preliminary ruling whether referencing those interviews would "open the

16  door" to the Luxor bombing case. (*Id.*)  The state district court responded:

17          You're just going to have to go along and do your case as it comes up. And I can't
            try and project exactly what's going to come out and what you're going to ask and
18          what they're going to reply to and - - you're just going to have to try it. I can't tell
            you what to do. I mean, it's not for me to tell you whether or not that's going to
19          open up a door. I don't know at this point in time.

20  (*Id.* at 16.)

21      Following Detective Robert Wilson's direct examination, Duarte-Herrera's counsel

22  requested a conference outside the presence of the jury:

23          [Counsel]: Your Honor, the reason why I asked us to take a break is because
            areas that I want to cover with Detective Wilson is he was in charge, obviously, the

34

Luxor case that we're trying to not necessarily open the door and bring into this Home Depot case. And I believe according to his reports, Dr. Duarte-Herrera was taken into custody I think by ICE. Actually, if I'm not mistaken, it was a mixed task or whoever that went to go see Mr. Herrera, both Las Vegas Metro and federal agents, but he was taken into custody on the 10th of May. I think booked into ICE for immigration reasons or purposes and then later rebooked obviously under the - - once statements were given regarding his involvement in other crimes under Metro jurisdiction.

But according to Mr. - - Officer - - Detective Wilson's report, there were several interviews that were conducted prior to the recorded ones where Mr. Duarte-Herrera had made some admissions. The area that I want to go into obviously was to bring that up to the jury that he was taken into custody several days prior to - - spoken to - - I think Detective Wilson says he only gave him *Miranda* four or five hours before but I believe in his statement I think he was spoken to several times prior to the 15th and the 14th and I just - - I think it's relevant for the jury to know - -

THE COURT: What happened several times before the 15th?

[Counsel]: Prior to the recorded statement being given. Because he was spoken to and interviewed several times from my understanding of your report, Detective Wilson's report, several times prior to the final recording ones where he's making admissions of being involved with the bombs. And I think it goes to the weight of how much weight the jury needs to give if they - - of Mr. Duarte-Herrera's statement itself is the purpose why I want to inquire into that area because they - - you know, obviously, the jury gets to determine the credibility of the statement itself whether they want to choose to believe his confession or not his confession. I know, you know, if it doesn't match up with some of the evidence, it's up to the jury to say we don't think he necessarily confessed to the crime.

THE COURT: Your objection is how many times he was given *Miranda* rights? What - -

[Counsel]: No, no not how many times he was given *Miranda* rights. I want to get into an area - - obviously, [the prosecutor] was very specific in his direct examination talking only about his involvement giving him the *Miranda* at the time of the recordings giving the impression to the jury that he was taken into custody maybe the 14th or 15th before he'd given the statements when that's not accurate. He was actually in custody May 10th, interviewed several times that were not recorded and then on the 14th and 15th gave statements.

THE COURT: So why don't you just - - why can't you ask him that?

[Counsel]: Well, I want to ask him that. What I'm saying is our position is we don't feel that that opens the door of Luxor at all by inquiring into these other interviews. I think that the State has the opposite position of that.

35

THE COURT: That he was in custody prior to an interview?

. . . .

[Counsel]: No, that he was in custody several days prior to and interviewed several times that were not recorded prior to the recorded interviews.

[The prosecutor]: Well, Judge, here's my position. And I think the answer to this question comes down to one issue and one issue only. What's the relevance of asking that question? And as [counsel] forthrightly states to this Court that why they're asking that question is because tomorrow they're going to be arguing to this jury and asking for an instruction from this Court about the voluntariness of statements made by the Defendant to police in this case. The argument is going to be that these other interviews and the length of detention before the interviews that Detective Wilson has testified to, the only thing that this jury knows about the interviews of this Defendant as it sits right now is two interviews; one conducted by him, after he gave *Miranda*, Araujo conducted a relatively brief interview of the Defendant.

If the argument and the relevance of those interviews without touching the subject matter of them is then to argue therefore, he's badgered and that these statements are not to be given the weight that they have on its face, we undoubtedly do contest that that opens the door to Luxor because that's what those interviews involved. In other words, what counsel wants is to make an inference that doesn't exist. That would be [a] lie as based upon what the evidence is; that is, this man is being badgered by multiple interviews from other agencies about this case that weren't recorded and then all of a sudden the detectives from Metro come in, turn on a tape recorder and bingo, bango Mr. Duarte-Herrera confesses to the Home Depot bombing. That's an entirely misstatement of what occurred in this case and, thus, once again I'd suggest that the answer to the question is does it open the Home Depot - - or the Luxor door or not is what are you going to argue from it? The answer is the 800 pound gorilla in the room about the interviews of this man in May of 2007 was the Home Depot murder and bombing that occurred. It was an artifact of those interviews that the Home Depot popped up and lo and behold a cold case is now revived and they got their man.

So that's the misappropriation of - - or the misinterpretation of this evidence in front of the jury. And how can the State rebut or answer that question? We would be absolutely handcuffed to not mention that the interviews had nothing to do with this case. They weren't trying to soften up the Defendant. They were about another case.

THE COURT: Well, in essence what you're saying is there was no probably [sic] cause to hold the Defendant and ask him any questions about anything. And you're saying, well, you know, this is all harassment because he's had more interviews. Well, he's had interviews on what? And you're implying that he was

harassed by these interviews and in essence, no probably [sic] cause even to hold him.

[The prosecutor]: Or certainly at the least that they're going to argue that these statements where he does confess that are recorded are involuntary and that's a complete misstatement of the actual events in this case.

As counsel knows, those interviews involved the Luxor bombing and murder. They weren't softening up this guy and peppering him with the Home Depot until he finally broke.

[Counsel]: And I think that's a little bit of misstatement. Obviously, I think Luxor was contained in some of those interviews but I also think that Home Depot was as well because Araujo was involved in that case as well. And I know Detective Wilson can clear that up. He was the one that was conducting these interviews prior to him being Mirandized and prior to them being recorded.

THE COURT: You're not going to have your cake and eat it too here, counsel. If you're going to open it up, you're going to open it up as to why he was being held and why he was being interviewed and whether there was probable cause to hold him and whether or not all of this then was part of this case here where - - when this detective and the other detective interviewed him, it was involuntary. You just can't - - you can try but if you open it up, you open it up. It's up to you to devise your own strategy here as to what you're going to do and how you're going to do it but if you open it up, they're entitled to contradict it.

(ECF No. 77-2 at 64–68.)

## 2.    State court determination

In affirming, in part, and reversing, in part, Duarte-Herrera's judgment of conviction, the

Nevada Supreme Court held:

Duarte-Herrera contends that the district court violated his rights to due process, a fair trial, present a defense, and confront his accusers when it ruled that he could not cross-examine police detectives about the voluntariness of his statements without opening the door to testimony that he was also interviewed about the Luxor Hotel-Casino bombing. "We generally review a district court's evidentiary rulings for an abuse of discretion. However, whether a defendant's Confrontation Clause rights were violated is ultimately a question of law that must be reviewed de novo." *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009) (internal citation and quotation marks omitted).

The record does not support Duarte-Herrera's contention that the district court made a ruling. Duarte-Herrera asked the district court if he could cross-

37

examine the detectives about his in-custody status and the multiple unrecorded interviews that he was subjected to. He believed that this line of questioning would show that his will was overborne by repeated interviews and would support his theory of defense that his statement was not made voluntarily. The district court, however, recognized that this line of questioning might open the door to otherwise inadmissible evidence by creating a false impression that Duarte-Herrera was being held without adequate cause and was interviewed solely about the Home Depot bombing. *See U.S. v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988) (discussing the curative admissibility rule). The district court informed Duarte-Herrera that it was up to him to devise his own strategy, he could try asking these questions, but, if his cross-examination created a false impression, the State would be entitled to present rebuttal evidence. We conclude that the district court did not abuse its discretion or violate Duarte-Herrera's constitutional rights in this regard.

(ECF No. 56-4 at 3–4.)

### 3. Conclusion

Duarte-Herrera had a constitutional right to present a defense. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984))).  However, as the Nevada Supreme Court reasonably determined, the state district court did not infringe on this right by foreclosing Duarte-Herrera from questioning detectives about his earlier police interviews.  The state district court initially told Duarte-Herrera that it could not "tell [him] what to do," and after hearing counsel flesh out the issue prior to Detective Wilson's cross-examination, merely advised Duarte-Herrera to "devise [his] own strategy" with respect to not opening the door to the Luxor bombing case. (ECF Nos. 76-5 at 16; 77-2 at 68.)  Accordingly, as the Nevada Supreme Court reasonably determined, the state district court never ruled on the issue.  As such, the Nevada Supreme Court's denial of Duarte-Herrera's claim was neither contrary to, nor an unreasonable application of, clearly established federal law

and was not based on an unreasonable determination of the facts.  Duarte-Herrera is not entitled to federal habeas relief for ground 12.

### C.    Ground 13—jury instructions

In ground 13, Duarte-Herrera alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the state district court erroneously overruled his objections to three jury instructions—Jury Instruction Nos. 4, 15, and 17—and denied his proffered instructions in lieu of those instructions. (ECF No. 64 at 54–56.)

#### 1.    Background information

##### a.    Jury Instruction No. 4

Jury Instruction No. 4 provided:

> Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill.
> It is not necessary to prove the elements of premeditation and deliberation in order to prove attempted murder.

(ECF No. 78-3 at 6.)

During jury instruction discussions, Duarte-Herrera's counsel objected to the second paragraph of Jury Instruction No. 4 on the grounds it lessened the State's burden of proof and was "confusing and misleading" because "a jury will not understand the difference between deliberate intention and the deliberation." (ECF No. 78-2 at 3.)   The state district court overruled the objection. (*Id.* at 4.)

##### b.    Jury Instruction No. 15

Jury Instruction No. 15 provided:

> Statements of the defendant not made in court have been admitted into evidence. Before the jury may take such a statement into consideration, it must first decide whether or not it was given voluntarily. If the jury decides the statement was made voluntarily, it may use the statements in deliberations. If the jury decides that

a statement was not made voluntarily, the jury must disregard it. The State has the burden of proving the voluntariness of a statement by a preponderance of the evidence. This burden of proof should lead the trier of fact to find that the existence of the contested fact is more probable than its nonexistence.

(ECF No. 78-3 at 20.)

The State and Duarte-Herrera each submitted proposed instructions concerning "the voluntariness of the Defendant's statements in this case." (ECF No. 78-2 at 10.) Duarte-Herrera's proposed instruction provided, *inter alia*, that "an involuntary statement is one made under circumstances in which the accused clearly had no opportunity to exercise a free and unconstrained will." (*Id.* at 14.) The state district court stated that it was "going to use the State one since they have to prove the voluntariness of this one also by a preponderance of the evidence." (*Id.* at 10.)

### c.      Jury Instruction No. 17

Jury Instruction No. 17 provided:

The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense.

A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

(ECF No. 78-3 at 22.)

Duarte-Herrera objected to Jury Instruction No. 17, arguing that "it would require the Court to instruct the jury on what a material element is," and without a clarifying instruction, "the jury would be able to speculate as to which elements were material and which were not and that could

lessen the State's burden of proof." (ECF No. 78-2 at 11.)  Instead, Duarte-Herrera proposed an instruction that mirrored Nevada's presumption of innocence statute, Nev. Rev. Stat. § 175.191, which omitted the "material element" language and provided: "A Defendant in a criminal action is presumed to be innocent until the contrary is proved. And in case of a reasonable doubt whether the Defendant's guilt is satisfactorily shown, the Defendant is entitled to be acquitted." (*Id.*)  The state district court rejected Duarte-Herrera's instruction. (*Id.* at 12.)

### 2.    State court determination

In affirming, in part, and reversing, in part, Duarte-Herrera's judgment of conviction, the Nevada Supreme Court held:

> Duarte-Herrera contends that the district court made three jury instruction errors. "The district court has broad discretion to settle jury instructions, and this court reviews the district court's decision for an abuse of that discretion or judicial error." *Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005).

> First, Duarte-Herrera contends that the district court erred by instructing the jury that "[i]t is not necessary to prove the elements of premeditation and deliberation in order to prove attempted murder" because the instruction relieves the State of its burden to prove each element of the offense, is confusing and misleading, and is contradicted by Nevada caselaw. The State asserts that the language used in this instruction was taken directly from *Keys v. State*, 104 Nev. 736, 740-41, 766 P.2d 270, 273 (1988), and accurately reflects current Nevada law. We agree and conclude that Duarte-Herrera has not demonstrated an abuse of discretion or judicial error in this regard.

> Second, Duarte-Herrera contends that the district court erred when instructing the jury that it must find that his statements to the police were voluntary before they may be considered during deliberations because the instruction did not provide guidance for determining whether a statement was given voluntarily. Duarte-Herrera argues that part of his defense was that his statements were made involuntarily, he had a right to have the jury instructed on his theory of defense, and the district court should have given his proffered instruction. "A defendant in a criminal case is entitled, upon request, to a jury instruction on his theory of the case so long as there is some evidence, no matter how weak or incredible, to support it." *Harris v. State*, 106 Nev. 667, 670, 799 P.2d 1104, 1105-06 (1990) (internal quotation marks and alteration omitted). Both parties proffered instructions on the voluntariness of Duarte-Herrera's statement, and the district court found that both instructions were argumentative. The district court sustained Duarte-Herrera's

objection to the State's instruction, striking the instruction's second paragraph before presenting it to the jury. Because the amended instruction accurately reflects Nevada law, *see Carlson v. State*, 84 Nev. 534, 535-36, 445 P.2d 157, 158-59 (1968) (adopting the "Massachusetts Rule" and holding that "[t]he term 'voluntary' carries a clear meaning, without need for further definition or explanation"), and properly places Duarte-Herrera's theory of defense before the jury, *see Crawford*, 121 Nev. at 754-55, 121 P.3d at 589, we conclude that the district court did not abuse its discretion in this regard.

Third, Duarte-Herrera contends that the district court erred by instructing the jury that "the State [had] the burden of proving beyond a reasonable doubt every *material element* of the crime charged" (emphasis added). Duarte-Herrera asserts that the instruction was confusing and reduced the State's burden of proof because it did not identify the "material elements" of each charge. And he argues that *Nunnery v. State*, 127 Nev. ___, ___, 263 P.3d 235, 259-60 (2011) (upholding use of the "material element" language in jury instructions), was wrongly decided because it relied on prior opinions that did not specifically address the issue of whether a jury could be instructed to determine the "materiality" of an element of a crime. We conclude that the district court did not abuse its discretion by giving this instruction and reject Duarte-Herrera's request to overrule *Nunnery*.

(ECF No. 56-4 at 4–6.)

### 3.   Conclusion[13]

#### a.   Jury Instruction No. 4

As the Nevada Supreme Court, the final arbiter of Nevada law, reasonably determined, Jury Instruction No. 4 is an accurate reflection of Nevada law. *See Keys v. State*, 104 Nev. 736, 740–41, 766 P.2d 270, 273 (1988) ("Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill. This is all there is to it. There is no need for the prosecution to prove any additional elements, such as, say premeditation and deliberation."). And Duarte-Herrera fails to articulate how Jury Instruction No. 4 improperly relieved the State of its

---

[13] This court will not repeat the applicable standards for evaluating jury instructions, which were discussed in ground 2.

1    burden of proof. *See In re Winship*, 397 U.S. at 364.   Therefore, Duarte-Herrera fails to

2    demonstrate that Jury Instruction No. 4 was erroneous and violated his right to due process. *Estelle,*

3    502 U.S. at 72.

4                    **b.      Jury Instruction No. 15**

5            Duarte-Herrera argues that the involuntariness of his confession was a part of his defense

6    at trial, so the denial of his proposed jury instruction on the issue was erroneous. (ECF No. 98 at

7    19–20).   "As a general proposition a defendant is entitled to an instruction as to any recognized

8    defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *See*

9    *Mathews v. United States*, 485 U.S. 58, 63 (1988)); *see also Beardslee v. Woodford*, 358 F.3d 560,

10   577 (9th Cir. 2004) ("Failure to instruct on the defense theory of the case is reversible error if the

11   theory is legally sound and evidence in the case makes it applicable."); *Bradley v. Duncan*, 315

12   F.3d 1091, 1099 (9th Cir. 2002) ("[T]he state court's failure to correctly instruct the jury on the

13   defense may deprive the defendant of his due process right to a present a defense.").   Although

14   Duarte-Herrera's instruction on the issue was not given, the state district court instructed the jury

15   on the need to evaluate the voluntariness of his confession in Jury Instruction No. 15.   As the

16   Nevada Supreme Court, the final arbiter of Nevada law, reasonably determined, that instruction

17   was an accurate reflection of Nevada law. *See Carlson v. State*, 84 Nev. 534, 536, 445 P.2d 157,

18   159 (1968) (approving of a jury instruction regarding the voluntariness of a confession, explaining

19   that if the court determines a confession to be voluntary, "the jury is then instructed that it must

20   also find that the confession was voluntary before it may be considered").   And contrary to Duarte-

21   Herrera's contention that the instruction was erroneous "because it did not give any guidance for

22   how the jury should determine if a statement was given involuntarily" (ECF No. 98 at 19), the

23   Nevada Supreme Court has determined that "[t]he term 'voluntary' carries a clear meaning,

1    without need for further definition or explanation." *Carlson*, 84 Nev. at 536, 445 P.2d at 159.

2    Therefore, Duarte-Herrera fails to demonstrate that Jury Instruction No. 15 was erroneous, violated

3    his right to due process, or violated his right to present a defense.

### c.    Jury Instruction No. 17

5    "[T]he Constitution does not require that any particular form of words be used in advising

6    the jury of the government's burden of proof. Rather, 'taken as a whole, the instructions [must]

7    correctly conve[y] the concept of reasonable doubt to the jury.'" *Victor v. Nebraska*, 511 U.S. 1,

8    5 (1994) (internal citation omitted) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

9    And importantly, the Ninth Circuit Court of Appeals evaluated a nearly identical reasonable doubt

10   jury instruction in *Ramirez v. Hatcher*,[14] and "[a]lthough [it did] not herald the Nevada instruction

11   as exemplary, [it] conclude[d] that the overall charge left the jury with an accurate impression of

12   the government's heavy burden of proving guilt beyond a reasonable doubt" such that "the jury

13   charge satisfied the requirements of due process." 136 F.3d 1209, 1210–11, 1215 (9th Cir. 1998);

14   *see also Nevius v. McDaniel*, 218 F.3d 940, 944 (9th Cir. 2000) (holding that the reasonable doubt

15   jury instruction was identical to the one in *Ramirez*, so "[t]he law of this circuit thus forecloses

16   Nevius's claim that his reasonable doubt instruction was unconstitutional").  Because the Ninth

17   Circuit Court of Appeals had determined that the language used in Jury Instruction No. 17 is

18

19

---

20   [14] The only difference between the reasonable doubt jury instruction provided in Duarte-Herrera's trial and the reasonable doubt jury instruction provided in *Ramirez* was the omission of the word

21   "substantial." *Compare* ECF No. 78-3 at 22 (". . . Doubt to be reasonable, must be actual, not mere possibility or speculation."), *with Ramirez v. Hatcher*, 136 F.3d 1209, 1210–11 (9th Cir. 1998)

22   (". . . Doubt to be reasonable must be actual *and substantial*, not mere possibility or speculation.") (emphasis added).  However, because "the use of the term 'substantial' to describe reasonable

23   doubt has been disfavored," *Ramirez*, 136 F.3d at 1212, the reasonable doubt jury instruction provided in Duarte-Herrera's trial was more acceptable than the reasonable doubt jury instruction in *Ramirez*.

constitutional, Duarte-Herrera fails to demonstrate that Jury Instruction No. 17 violated his right to due process.

Because the Nevada Supreme Court's denial of Duarte-Herrera's jury instruction claims was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, Duarte-Herrera is not entitled to federal habeas relief for ground 13.

**D.      Ground 17—counsel's alleged failure to investigate innocence**

In ground 17, Duarte-Herrera alleges that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments when counsel failed to investigate actual innocence. (ECF No. 64 at 59–60.)  Duarte-Herrera's claim is based on counsel's failure to present evidence that his confession was coerced. (*Id.*)  Like grounds 9 and 10, this court previously held that this ground was not exhausted and was procedurally defaulted, subject to Duarte-Herrera overcoming that procedural default pursuant to *Martinez*. (ECF No. 83 at 7.)  This court deferred consideration of that issue "until the time of the merits determination." (*Id.*)  This court relies on the standards previously outlined in ground 9 for overcoming a procedural default pursuant to *Martinez*.

**1.      Background information**

Counsel cross-examined Detective Araujo about Duarte-Herrera's law enforcement interview taking place several days after he and his two brothers were taken into custody by United States Immigration and Customs Enforcement. (ECF No. 78-1 at 32.)  Counsel elicited Detective Araujo's admission that he surreptitiously recorded Duarte-Herrera's interview and that surreptitiously recording a suspect is "a technique or tactic . . . use[d] to . . . make the suspect feel more comfortable in order to get a statement or some kind of confession." (*Id.* at 33.)  Counsel

cross-examined Detective Araujo about other techniques he used to obtain a confession from Duarte-Herrera, including: (1) "minimiz[ing] the event itself" by telling Duarte-Herrera "that this would be a serious case if someone got hurt but since no one got hurt, only a vehicle, it's not that serious of a case," and (2) promising to vouch for Duarte-Herrera before the judge if he did something dumb and "didn't hurt anyone." (*Id.* at 36–37.)

### 2.   Conclusion

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  This investigatory duty includes investigating the defendant's defense and evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999); *see also Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994).  Counsel's cross-examination of Detective Araujo belies Duarte-Herrera's claim that counsel failed to meet these investigative duties regarding the coercive nature of his law enforcement interview.  Counsel cross-examined Detective Araujo about the interview taking place days after Duarte-Herrera and his brothers were taken into custody by U.S. Immigration and Customs Enforcement, the surreptitious recording of the interview, and the techniques used to mislead Duarte-Herrera into giving a confession.  Duarte-Herrera fails to articulate what further coercive factors counsel should have investigated and presented to the jury.  Because Duarte-Herrera fails to demonstrate counsel acted deficiently pursuant to *Strickland* in investigating the coercive nature of his law enforcement interview, ground 17 is a baseless claim.  As such, Duarte-Herrera cannot establish that ground 17 is a substantial claim for purposes of *Martinez*.  Ground 9 is therefore procedurally defaulted and does not provide a basis for federal habeas relief.

//

## V.    CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA), so this court has evaluated the remaining claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002).  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  For claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and this court's procedural ruling was correct. *Id*.  Applying these standards, a COA is unwarranted.

## VI.   CONCLUSION[15]

In accordance with the foregoing, **IT IS THEREFORE ORDERED**:

1.    The petition (ECF No. 64) is DENIED.

2.    A certificate of appealability is DENIED.

3.    The clerk of the court is directed to substitute William Hutchings for Respondent Brian Williams, enter judgment accordingly, and close this case.

Dated:   January 12, 2022

Gloria M. Navarro, Judge
United States District Court

---

[15] Duarte-Herrera requests that this court conduct an evidentiary hearing. (ECF No. 64 at 62.) Because this court has already determined that Duarte-Herrera is not entitled to relief and because neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this court's reasons for denying the petition, the request is denied.